WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| Sofia Bahena Ortuño; Gennady Valeryevich Lavrus; Claude Bent; Charles Joseph; Salomon Medina Calderon; Ricardo Vasquez Cruz; J Elias Solorio Lopez; Olvin Said Torres Murillo; Julio Cesar Buendia Alas; Marco Montoya Amaya; Mauricio Ernesto Quinteros Lopez; Roxana del Carmen Trigueros Acevedo; Ernesto Ambrocio Uc Encarnacion; | Case No. 3:20-CV-02064-MMC **DECLARATION OF HAYDEN RODARTE** JUDGE: MAXINE M. CHESNEY |
| Petitioners-Plaintiffs, | |
| v. | |
| DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | |
| Respondents-Defendants. | |

1   BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
2   TIFANEI RESSL-MOYER (SBN 319721)
tresslmoyer@lccrsf.org
3   HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
4   LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
5   SAN FRANCISCO BAY AREA
131 Steuart St #400
6   San Francisco, CA 94105
Telephone: (415) 814-7631
7
JUDAH LAKIN (SBN 307740)
8   judah@lakinwille.com
AMALIA WILLE (SBN 293342)
9   amalia@lakinwille.com
LAKIN & WILLE LLP
10   1939 Harrison Street, Suite 420
Oakland, CA 94612
11   Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

*Attorneys for Petitioners-Plaintiffs*
*Motion for Admission *Pro Hac Vice*
Pending

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Hayden Rodarte, declare as follows:

1.      I am an attorney admitted to practice in California and a member of the bar of this Court. I am a Justice Catalyst fellow and attorney employed at the Lawyers' Committee for Civil Rights of the San Francisco Bay Area and co-counsel for Petitioners-Plaintiffs in this action. I submit this declaration in support of Petitioners-Plaintiffs' Reply in Support of Preliminary Injunction. I have personal knowledge of the facts stated in this declaration.

2.      Attached as Exhibit A hereto are a table of data and an accompanying line graph showing the number of COVID-19 cases among individuals in U.S. Immigration and Customs Enforcement ("ICE") detention per day, as reported by ICE at https://www.ice.gov/coronavirus (click on "Confirmed Cases"). This webpage is updated on a nearly daily basis, sometimes multiple times per day, and ICE provides a date- and time-stamp each time it updates this data. I have verified all of the historical data for dates prior to April 24, 2020 using a search tool located at www.web.archive.org, popularly referred to as the "wayback machine." The accompanying line graph correctly represents the data appearing in the table.

3.      Attached as Exhibit B to this declaration is a true and correct copy of the declaration of Dr. Robert B. Greifinger, previously filed as ECF No. 5-2 in *Zepeda Rivas v. Jennings*, No. 3:20-cv-02731-VC (N.D. Cal.) ("Zepeda Rivas").

4.      Attached as Exhibit C to this declaration is a true and correct copy of the declaration of Dr. Sandra Hernandez, previously filed as ECF No. 35 in *Zepeda Rivas*.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of April 2020 in Oakland, California.

_____/s/ Hayden Rodarte
Hayden Rodarte

Exhibit A

| Date | Number of Confirmed COVID-19 Cases Among ICE Detainees |
|---|---|
| 3/27/20 | 2 |
| 3/28/20 | 2 |
| 3/29/20 | 2 |
| 3/30/20 | 4 |
| 3/31/20 | 4 |
| 4/1/20 | 4 |
| 4/2/20 | 6 |
| 4/4/20 | 8 |
| 4/6/20 | 13 |
| 4/7/20 | 19 |
| 4/8/20 | 32 |
| 4/9/20 | 48 |
| 4/10/20 | 61 |
| 4/11/20 | 61 |
| 4/12/20 | 61 |
| 4/13/20 | 72 |
| 4/14/20 | 77 |
| 4/15/20 | 89 |
| 4/16/20 | 100 |
| 4/17/20 | 124 |
| 4/18/20 | 124 |
| 4/19/20 | 124 |
| 4/20/20 | 220 |
| 4/21/20 | 253 |
| 4/22/20 | 287 |
| 4/23/20 | 297 |
| 4/24/20 | 317 |
| 4/27/20 | 360 |
| 4/28/20 (last checked 4/29/20 at 1:12PM PST) | 425 |





# Exhibit B

WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS,
BRENDA RUIZ TOVAR, LAWRENCE
MWAURA, LUCIANO GONZALO
MENDOZA JERONIMO, CORAIMA
YARITZA SANCHEZ NUÑEZ, JAVIER
ALFARO, DUNG TUAN DANG,
                    Petitioners-Plaintiffs,

v.

DAVID JENNINGS, Acting Director of the
San Francisco Field Office of U.S. Immigration
and Customs Enforcement; MATTHEW T.
ALBENCE, Deputy Director and Senior
Official Performing the Duties of the Director
of the U.S. Immigration and Customs
Enforcement; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; GEO GROUP,
INC.; NATHAN ALLEN, Warden of Mesa
Verde Detention Facility,

                    Respondents-Defendants.

**DECLARATION OF ROBERT B.
GREIFINGER, MD**

1  BREE BERNWANGER* (NY SBN 5036397)
   bbernwanger@lccrsf.org
2  TIFANEI RESSL-MOYER (SBN 319721)
   tresslmoyer@lccrsf.org
3  HAYDEN RODARTE (SBN 329432)
   hrodarte@lccrsf.org
4  LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS OF
5  SAN FRANCISCO BAY AREA
   131 Steuart St #400
6  San Francisco, CA 94105
   Telephone: (415) 814-7631
7
   JUDAH LAKIN (SBN 307740)
8  judah@lakinwille.com
   AMALIA WILLE (SBN 293342)
9  amalia@lakinwille.com
   LAKIN & WILLE LLP
10 1939 Harrison Street, Suite 420
   Oakland, CA 94612
11 Telephone: (510) 379-9216
   Facsimile: (510) 379-9219
12
   JORDAN WELLS (SBN 326491)
13 jwells@aclusocal.org
   STEPHANIE PADILLA (SBN 321568)
14 spadilla@aclusocal.org
   AMERICAN CIVIL LIBERTIES UNION
15 FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West Eighth Street
16 Los Angeles, CA 90017
   Telephone: (213) 977-9500
17 Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
*Motion for Admission Pro Hac Vice Forthcomin*

# Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1.  I am a physician who has worked in health care for prisoners and detainees for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2.  I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

## Foundation

3.  In connection with my participation as an expert witness in this case, I have reviewed the following documents concerning ICE's policy and practice related to the coronavirus (collectively "ICE COVID protocols"):

    *   The March 6, 2020 interim guidance sheet[2] produced by ICE Health Services Corps, the body that oversees ICE detention facilities' medical care,
    *   ICE's guidance on its website, last updated April 14, 2020 ("ICE Website Guidance"),[3] and
    *   ICE ERO's COVID-19 Pandemic Response Requirements, last updated April 10, 2020 (which I refer to later as the "April 10 Guidance").[4]

4.  I have also reviewed the following documents concerning the Mesa Verde and Yuba County Jail immigration detention facilities:

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

[2] ICE Health Service Corps, *Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)* (Mar. 6, 2020), https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus.

[3] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, ICE.GOV (last updated Apr. 14, 2020), https://www.ice.gov/covid19.

[4] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.aila.org/infonet/ice-ero-releases-covid-19-pandemic-response.

- The declarations of fact witnesses produced in this case concerning the conditions at Mesa Verde Detention Center and the ICE detention facility at Yuba County Jail (Lisa Knox and Kathleen Kavanaugh, respectively);

- Declarations of Plaintiffs and other declarants in this case describing the conditions at the detention facilities;

- The California Department of Justice Review of Immigration Detention in California (February 2019), including descriptions of the facilities and the capacity of Mesa Verde Detention Center and Yuba County Jail[5] ("CalDOJ Report");

- The 2018 Prison Rape Elimination Act audit for Mesa Verde, describing four dorms, three restricted housing unit cells, and medical isolation rooms (page 2) ("Mesa Verde PREA Audit");

- Declarations of Carl Takei (Dkts. 177-1 & 119-20) from the motion for summary judgment in *Lyon v. ICE*, Case 13-cv-05878 (2016), including exhibits which contain photographs and video stills of Mesa Verde dorms and other facilities circa 2015 (Dkt. 177-1) ("Takei Mesa Verde Declaration"), and providing the foundation for photographs of Yuba County Jail (119-20, including photographs of Unit I (DSC 105 at Dkt. 197-15), Unit R (DSC 112 & 114 at Dkt. 197-15), and Unit C (DSC 198, at Dkt. 197-17);

- Redacted expert report of Michael A. Berg from motion for summary judgment in *Lyon v. ICE*, Case 13-cv-05878 (2016), including a description of the Yuba County Jail housing units ("Berg Report");

- Declaration of Phil Stanley from *Hedrick v. Grant* consent decree proceedings (2016),[6] with a general description of the Yuba County Jail housing units (paragraphs 12-14) ("Stanley Declaration").

**COVID-19**

5. COVID-19 is a disease caused by a coronavirus that has reached pandemic status. As of April 14, 2020, according to the World Health Organization, nearly two million people have been diagnosed with COVID-19 around the world and 117,000 people have died.[7] In the United States, nearly 700,000 people have been diagnosed and more than 35,000

---

[5] https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf.
[6] Declaration of Phil Stanley in Support of Plaintiffs' Motion to Enforce Consent Decree and for Further Remedial Orders, Oct. 20, 2016, Case No. 2:76-cv-00162-GEB, Dkt. 163-4, at https://bloximages.newyork1.vip.townnews.com/appeal-democrat.com/content/tncms/assets/v3/editorial/7/15/71575698-9b0b-11e6-824a-5f3b62160b74/580febccf3c58.pdf.pdf
[7] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-85, Apr. 14, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200414-sitrep-85-covid-19.pdf?sfvrsn=7b8629bb_4 (last accessed Apr. 18, 2020).

people have died thus far.[8] These numbers are likely an underestimate, due to the lack of availability of testing in countries like the United States.

6. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

7. People in the high-risk category for severe COVID-19, i.e., older adults or those with underlying disease, are likely to suffer serious illness and death. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age including blood disorders, chronic kidney or liver disease, compromised immune system, including from HIV, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, hypertension, obesity, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

8. In the United States, younger adults with COVID-19 have been severely affected by the disease as well. While people under the age of 20 have largely been protected from severe effects of the coronavirus, 55% of COVID-19 hospitalizations and 20% of deaths were from people between the ages of 20 and 64.[9] The World Health Organization has recognized that the risk of severe COVID-19 gradually increases with age, beginning at around 40 years old.[10] Reports from New York City, the area hardest-hit by the virus in the United States, show a surprising number of people severely affected who are younger and without known underlying conditions.[11]

9. A primary concern of medical and public health experts and public officials is the effect that the pandemic is having and will have on health systems. Because severe COVID-19 cases require extended hospitalization and intensive medical care, a significant number of COVID-19 cases can quickly overwhelm a health system. This is true in urban areas, but is particularly true in rural areas where health care facilities have far more limited capacity to respond to an increase in patients who need hospitalization and intensive care.

**Mitigation Measures**

10. The mode of transmission of COVID-19 is believed to be through close exposure

---

[8] Centers for Disease Control and Prevention, Coronavirus Disease 2019: Cases in the US, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Apr. 18, 2020).
[9] Centers for Disease Control and Prevention, "Morbidity and Mortality Weekly Report: Severe Outcomes Among Patients with Coronavirus Disease 2019," Mar. 27, 2020, at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm (last accessed April 18. 2020).
[10] World Health Organization, "Coronavirus Disease 2019: Situation Report—51," Mar. 11, 2020, at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.
[11] See, e.g., Michelle Fay Cortez & Olivia Carville, "Many New York Coronavirus Patients Are Young, Surprising Doctors," Bloomberg, Apr. 1, 2020, at https://www.bloomberg.com/news/articles/2020-04-01/coronavirus-in-young-people-ny-patients-skew-younger-some-die.

of someone to a person who is infected with the virus, most commonly through respiratory droplets released when a person speaks, coughs or sneezes. Transmission is also possible through contact with contaminated surfaces. There is ongoing scientific debate about whether coronavirus is airborne – and transmitted through aerosols, which stay in the air longer than droplets, thus far accepted as the primary means of transmission.[12] The extent and importance of airborne (or aerosol) transmission in the community (non-healthcare setting) is uncertain at this time but a cause for concern and suggests that additional protective measures should be taken.

11. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. The recommended hand hygiene measures are frequent handwashing with soap and water and the use of alcohol-based sanitizers when handwashing is unavailable. Surfaces such as doorknobs and light switches which have a high degree of human contact should be cleaned and disinfected regularly with bleach.

12. In addition, health care providers and individuals who come into contact with those exposed to, or infected with, COVID-19 should have access to personal protective equipment, including gloves, masks, and gowns.

13. In light of the mixed evidence about airborne transmission, public health experts are increasingly recommending additional mitigation measures, such as improved indoor ventilation, a prohibition on indoor gatherings, and a requirement that all individuals wear masks.

14. Recognizing the urgency and severity of the pandemic, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of a risk mitigation strategy. California Governor Gavin Newsom has directed all California residents to shelter in place in order to limit the spread of the coronavirus.[13]

15. California is one of the states in the United States most severely affected by COVID-19. There are a total of more than 27,500 reported positive cases and nearly 1,000 deaths. The state health authorities have confirmed community transmission since late February.[14]

---

[12] *See, e.g.*, World Health Organization, "Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations," Mar. 29, 2020, https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations; Dyani Lewis, "Is the Coronavirus Airborne? Experts Can't Agree," Nature, Apr. 2, 2020, at https://www.nature.com/articles/d41586-020-00974-w.

[13] See https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf , accessed March 20, 2020.

[14] See https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx, accessed March 20, 2020.

**Risks in Immigration Detention**

16. The conditions of congregate settings, such as jails and immigration detention facilities, pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

17. Immigration detention facilities are enclosed environments, much like the cruise ships and nursing homes that have been and contine to be the sites of some of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, the lack of ventilation, and often scant medical care resources. There have been numerous historic documented influenza outbreaks in detention facilities in the United States and around the world.

18. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between each use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

19. There are often insufficient cleaning supplies, and people to conduct the required intensive cleaning. Detainees are typically not provided hand sanitizer per the rules of the facilities. Personal and shared spaces in immigration detention centers are often poorly ventilated which increases the transmissibility of infectious diseases whether airborne or spread by droplet.

20. Detainees enter the detention centers from outside and new detainees bring with them a new risk of infection transmission. Staff arrive and leave on a shift basis and interact daily with others outside of the detention facility; there is little to no ability to adequately screen staff for new, asymptomatic infection.

21. There are increasingly reports of COVID-19 infections in correctional and detention sites around the country. Once COVID-19 is introduced into these facilities, it spreads like wildfire. In mid-March, the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case. Rikers now has a rate of infection that is far higher than the infection rates of the most infected regions of the world.[15] By March 30, 167 inmates, 114 correction staff and 20 health workers at Rikers tested positive for COVID-19; two correction staff members have died and multiple inmates have been hospitalized.[16] The Chief Medical Officer of Rikers has described a "public health disaster unfolding before

---

[15] As of March 26, Wuhan, China had an infection rate of 4.59 per 1,000 people, Lombardy, Italy had an infection rate of 3.48 per 1,000 people, and New York City had an infection rate of 2.15 per 1,000 people. Legal Aid

[16] Jan Ransom & Alan Feuer, "'We're Left For Dead': Fears of Virus Catastrophe at Rikers Jail," NY Times, Mar. 30, 2020, at https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

our eyes." In his view, following CDC guidelines has not been enough to stem the crisis: "infections in our jails are growing quickly despite these efforts."[17]

22. Like the explosive growth at Rikers, the Cook County Jail went from two confirmed COVID-19 cases on March 23 to 134 cases in a matter of one week,[18] and up to 342 confirmed inmate cases on April 16, 2020.[19] Three inmates have died.[20] In one facility for which I work for the federal court as a medical monitor, there have been 47 test-positive custody staff members, and 11 test-positive health care staff, and 24 test-positive inmates, with multiple other tests pending results as of April 17, 2020.

23. For all of these reasons, it is highly likely, and perhaps inevitable, that COVID-19 would reach the immigration detention facilities, including in California, and it has. It has been reported as of April 17, 2020 that ICE has tested only 300 detainees across the country for COVID-19, and that one-third of those tested were confirmed positive.[21] Otay Mesa Detention Center, in San Diego, is reported to have the highest number of confirmed COVID-19 cases.[22] It is notable that there are so many confirmed cases despite evidence of so few tests being conducted at immigration detention facilities.

24. The heightened risk of infectious disease transmission in immigration detention centers threatens the health of detainees, staff and the broader population. An outbreak in the detention facility will likely increase the transmission in the community as detainees will be released, and staff, contractors, and vendors will come and go from the facilities to the communities.

**Medical Care in Immigration Detention**

25. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond

---

[17] Ross MacDonald (@RossMacDonaldMD), Twitter (Mar. 30, 2020, 8:03 PM), https://twitter.com/rossmacdonaldmd/status/1244822686280437765?s=12 ("I can assure you we were following the CDC guidelines before they were issued. We could have written them ourselves. . . [I]infections in our jails are growing despite these efforts.").

[18] Sam Kelly, "134 Inmates at Cook County Jail Confirmed Positive for COVID-19," Chicago Sun Times, Mar. 30, 2020, at https://chicago.suntimes.com/coronavirus/2020/3/29/21199171/cook-county-jail-positive-134-cases-covid-19.

[19] Andy Grimm, *'I feel like I lost the battle for my husband,' widow of dead Cook County Jail detainee says*, Chicago Sun Times, https://chicago.suntimes.com/2020/4/16/21224183/lost-battle-husband-widow-dead-cook-county-jail-detainee-coronavirus (Apr. 16, 2020).

[20] *Id.*

[21] Tanvi Misra, "ICE's COVID-19 test figures hint at health crisis in detention," Roll Call, Apr. 17, 2020, at https://www.rollcall.com/2020/04/17/ices-covid-19-test-figures-hint-at-health-crisis-in-detention/.

[22] Kate Morrissey, "Otay Mesa immigration courts closed, hearings postponed as detention facility COVID-19 cases grow," San Diego Union Tribune, Apr. 15, 2020, at https://www.sandiegouniontribune.com/news/immigration/story/2020-04-15/otay-mesa-immigration-courts-closed-hearings-postponed-as-detention-facility-covid-19-cases-grow.

the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

26. Even where they do have formal linkages with local health departments or hospitals, detention facilities are often in under-resourced areas where the local health department or hospital would quickly become overwhelmed in the face of an infectious disease outbreak.

27. Immigration detention facilities and jails are ill-equipped to diagnose and manage the spread of a disease like COVID-19. Health care providers should have access to personal protective equipment, including masks. Access to resources for testing and personal protective equipment are often inadequate in immigration detention facilities.

28. Those infected and symptomatic should be isolated in negative pressure rooms, which rarely exist in jails and detention facilities. Where such negative pressure rooms do exist, there are rarely enough to be available in the event of an outbreak.

**Risk Mitigation**

29. Risk mitigation is the only viable public health strategy available to limit transmission of infection, morbidity and mortality in immigration detention centers, and to decrease the likely public health impact outside of the detention centers.

30. For a disease that is either spread by droplets or aerosol, the most effective mitigation strategy to limit the spread of the virus is to reduce crowding, as this increases the opportunity for social distancing.

31. The detention center is a microcosm of the broader community. Social distancing and scrupulous hygiene and sanitation are required to avoid infection or an outbreak. If there is inadequate social distancing, hygiene and sanitation, there will almost certainly be infection and an outbreak. In the event of an outbreak, those who are medically vulnerable will be most immediately at risk, but eventually the effect will be felt by all as the health care infrastructure will be inadequate to respond to the needs.

32. In an immigration detention center, even if everyone is isolated in a single cell, there is still an increased risk of transmission among detainees and staff because the institutional setting requires the delivery of food, cleaning supplies, documents, and other items. However, in most immigration detention facilities, individuals are not isolated in a single cell, or housed in an environment where social distancing is an option. This massively increases the risks of transmission and an outbreak in the detention centers.

**Mesa Verde Detention Center and ICE Detention at Yuba County Jail**

33. From my review of the available evidence, I have grave concerns about the possibility of social distancing, and other risk mitigation measures, at Mesa Verde Detention Center and for ICE detainees at Yuba County Jail.

34. I understand that there is no capacity for social distancing in the sleeping arrangements for detainees at Mesa Verde Detention Center or for the ICE detainees at Yuba County Jail. Detainees are almost all in bunk beds, which by definition prohibits social distancing as the distance between the upper and lower bunks is less than six feet. In almost all cases where there is more than one bunk to a room, detainees who sleep in bunk beds report that they sleep within reaching distance of at least one other bed where someone is sleeping.[23]

    a. At Mesa Verde Detention Center there are four units: A, B, C and D. Unit B is used for women while the remaining units are used for men.[24] Each dormitory room houses 100 detainees in bunk beds only a few feet apart.[25] As one of the declarants described: "[The bunk beds] are so close to one another that I can reach out my arms and touch another bunk bed. I sleep on the bottom bunk and if I sit up, I will bump my head on the upper bunk."[26] This is fundamentally a congregate living space where there is a high risk of infectious spread. From the reports of those currently detained there, some if not all of the units are at or near capacity.

    b. Yuba County Jail has a more diverse set of sleeping arrangements, but none of the sleeping arrangements appear safe in the context of the coronavirus. Detainees sleep in "linear-style open bar front cells," dormitories, or double-celled housing.[27] Regardless of the type of room, most ICE detainees at Yuba sleep in housing units where they are in bunk beds which are fewer than six feet away from the other bed in the same bunk, and fewer than six feet from the next bunk bed.[28] I understand that ICE detainees at Yuba County Jail are typically commingled with County detainees held for criminal offenses or awaiting trial.[29] This means that there are significant numbers of detainees transferred in and out of the units, something reported at both facilities by declarants,[30] which carries inherent risks as described above. While Yuba County Jail has reportedly released some people so the jail is not at capacity, from the current reports of those detained, the units are still sufficiently crowded that social distancing is not possible.

        i. The "tanks" in the "Old Jail" at Yuba—Units G through L—are "not enclosed rooms" but are "separated from the corridors only by a set of bars, with open spaces between the bars, so air flows freely between the tanks and corridors." Each "tank" has space for

---

[23] *See, e.g.*, Declaration of Dung Tuan Dang, paras. 11, 13-14; Declaration of Javier Alfaro, para. 18; Declaration of Coraima Yaritza Sanchez Nuñez, para. 14.
[24] Berg Report at 10.
[25] Mesa Verde PREA Audit at 2; Knox Declaration, para. 9; Takai Mesa Verde Declaration at 4, 10-12.
[26] Declaration of Javier Alfaro, para. 16.
[27] Stanley Declaration, para. 12-14.
[28] Kavanagh Declaration, para. 5 (Yuba). *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 14; Declaration of Lawrence Kuria Mwaura, para. 10.
[29] Kavanagh Declaration, para. 3 (Yuba).
[30] *See, e.g.*, Declaration of Dung Tuan Dang, para. 12; Declaration of Javier Alfaro, para. 17; Declaration of Coraima Yaritza Sanchez Nuñez, para. 16.

approximately two dozen men who sleep in "sets of bunk beds that are spaced only a few feet apart."[31] In the tanks, according to the Kavanagh fact declaration, it is "impossible for people to be six feet apart from each other."[32]

   ii.  B and C pods are "large open rooms" with bunk beds holding approximately 50 people each, with each bed only a few feet apart from the next. B pod includes both ICE and County detainees; C pod is exclusively ICE detainees.[33] T is compromised of "two interconnected small rooms with multiple bunks lining the walls."[34]

   iii.  P and R Pods are female housing units of congregate living space. R Pod includes "approximately two dozen bunk beds spaced a few feet apart lining one wall, a half wall dividing the room lengthwise, and a row of tightly spaced tables," as well as "approximately three showers with plastic dividers between them." According to the Kavanagh fact declaration, "the size and layout . . . make[s] it hard to navigate without coming very close to or into direct physical contact with others."[35] P Pod, another female housing unit, includes space for a dozen women in a very compact space.[36]

   iv.  D, E and F pods are "approximately twenty two-person cells" where individuals sleep in bunk beds. Each cell has a bunk bed, sink and toilet. According to the Kavanagh fact declaration, "When two detainees are anywhere in their small cells, it would be impossible for them to be six feet apart."[37] Q1 and Q2 are two-person cells.[38]

   v.  There are two "administrative segregation units—the 'A-pod' for men and the 'S-Tank' for women." These are "one- and two-person celled housing," which together have the capacity for 46 individuals.[39] Even if these units created the possibility of achieving greater social distancing for a small number of persons at Yuba, they would be nowhere near sufficient to solve the social distancing problems confronted by the vast majority of the detainee population.

---

[31] Kavanagh Declaration, para. 9.

[32] Kavanagh Declaration, para. 9. *See also* Berg Report at 9; Photographs DSC 00179 & 00180 (Yuba Unit L).

[33] Kavanagh Declaration, para. 6. *See also* Berg Report at 9; Photograph DSC 00198 (Yuba Unit C)

[34] Berg Report at 9.

[35] Kavanagh Declaration, para. 10. *See also* Photographs DSC 00112 & 00114 (Yuba Unit R).

[36] *Id.*

[37] Kavanagh Declaration, para. 7 (Yuba). *See also* Berg Report at 9 ("Units D, E, and F are celled units that hold about fifty inmates each."). DSC 00106 (Yuba Unit I, with bolted table against the wall); DSC 00179 (Yuba Unit L, with bolted table and chairs); DSC 00175 (Yuba Unit K); DSC 00105 & 00106 (Yuba Unit I). Knox Declaration, para. 9 (Mesa Verde).

[38] Berg Report at 9.

[39] Stanley Declaration, para. 12-14. *See also* Berg Report at 9 ("S1, S1, S3, S4, S5, and S6 are two-bed cells used for segregation.").

35. Because detainees get in and out of bed, bunk beds that are closer than ten feet from one another will not allow adequate social distancing. Moreover, the risk of disease tramsmission from communal sleeping arrangements is greater than the risk of risk of transmission for otherwise being in the proximity of infected individuals for short periods of time, for instance passing individuals in the street or the grocery store. This is because risk increases in confined spaces as the time increases.

36. I understand that there are few isolation cells, which together would be insufficient for segregating individuals who are confirmed infected.

    a. At Mesa Verde Detention Center, there are believed to be "fewer than five isolation cells," which are typically occupied by those with chronic mental health conditions or subject to disciplinary isolation.[40] There are medical isolation rooms in the medical unit which are sometimes used for "protective custody segregation." There is also a restrictive housing unit (RHU) consisting of three single cells, and used for "protective custody, administrative segregation, and disciplinary segregation."[41]

    b. At Yuba County Jail, there are also six medical isolation cells (M-cells), four holding cells and two safety cells.[42]

37. I understand that there is no capacity for social distancing at mealtimes, recreation, or in the bathrooms at either facility. Multiple declarants even reported that they had only heard of "social distancing" from the news, but not from detention center authorities.[43]

    a. At both facilities, most of the tables used by all detainees are bolted to the ground and with attached chairs or benches which cannot be moved, and where detainees sit only a few feet apart.[44] Detainees report that they can touch the others seated at a table easily – they sit "elbow to elbow," as one detainee described – and no efforts have been made to permit or encourage social distancing at mealtimes. Individuals also often line up to get meals.[45]

    b. In both facilities, there is very limited area for eating and recreation and it is often impossible to use these these areas with adequate spacing between people. There is also limited and inadequate ventilation.[46]

    c. There are typically small common areas with common tables where

---

[40] Knox Declaration, para. 9 (Mesa Verde).
[41] Mesa Verde PREA Audit at 2.
[42] Stanley Declaration, para. 12-14.
[43] Declaration of Javier Alfaro, para. 20.
[44] Kavanagh Declaration, para. 3 (Yuba); Takei Photographs, Dkt. 197-17, Dkt. 197-15 (Yuba); Takei Mesa Verde Declaration, photographs at 5, 24, 25 (Mesa Verde). *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 14; Declaration of Coraima Yaritza Sanchez Nuñez, para. 14.
[45] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 14; Declaration of Lawrence Kuria Mwaura, paras. 12-13; Declaration of Coraima Yaritza Sanchez Nuñez, para. 14.
[46] *See generally* Kavanagh Declaration (Yuba); Knox Declaration, para. 10 (Mesa Verde).

individuals eat and recreate "with very little room to maneuver."[47] Detainees report that the tables and chairs are full at mealtimes, and they have to line up to get food, one after another, without adequate spacing between people.[48]

d. Shower and toilet stalls are not six feet apart. At Mesa Verde, each unit of 100 detainees has a shared bathroom of "two multi-user bathrooms consisting of five showers, five toilets, and seven sinks."[49] At Yuba, toilets and showers are typically "separated only by thin dividers that rise to around shoulder height."[50] Detainees report being "shoulder to shoulder" with other detainees, or within arms reach, if at the sink, in the shower, or at the toilet.[51] Detainees report that there are sometimes lines to use the bathroom, guaranteeing that there is no social distancing either in the bathroom or waiting for the bathroom.

e. Individuals move in and out of small telephone booths, packed closely to each other and close to other people.[52]

38. From current reports from those detained at the facilities, there is inadequate care and attention given to hygiene and sanitation, increasing the risks of infectious spread. I understand that there are limited instructions about hygiene and sanitation provided to detainees, and insufficient supplies given to detainees to enable them to practice proper hygiene and sanitation. Plaintiffs have reported that the common areas, including the bathrooms, are unsanitary.

a. Plaintiffs report that they have learned little about the coronavirus and protective measures from authorities at the detention centers. Multiple people reported that they learned about social distancing from the news, rather than from the authorities, and that there have been no efforts to implement or enforce social distancing within the facilities.[53]

---

[47] *See, e.g.*, Kavanagh Declaration, para. 9.

[48] *See, e.g.*, Declaration of Dung Tuan Dang, paras. 17-18.

[49] Mesa Verde PREA Audit at 2; Takei Mesa Verde Declaration, photograph at 14 (Mesa Verde). *See, e.g.*, Declaration of Dung Tuan Dang, paras. 14-15 ("On each side of the dorm there are two urinals and three toilet stalls. In the morning there is a line for the bathrooms. There is no distancing when you are in line. When you stand to go pee at a urinal, and if someone else is peeing at the same time, they are standing right next to you – they could be inches away depending on the size of the person. The closed toilet stalls are separated by wood panels. The panels do not go all the way up to the ceiling. If someone stands in the stall next to you, you can see their head. They are the same distance away as the distance between the urinals. In the restroom area there are five sinks for washing your hands and brushing your teeth. The sinks are in an open area without dividers. The distance between the sinks is about a hand length if you stretch your fingers out wide."); Declaration of Javier Alfaro, para. 22.

[50] Kavanagh Declaration, para. 6. *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 15; Declaration of Lawrence Kuria Mwaura, para. 16.

[51] *See, e.g.*, Declaration of Coraima Yaritza Sanchez Nuñez, para. 12.

[52] Kavanagh Declaration, para. 8. *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 16.

[53] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 20.

    b. Plaintiffs have reported the lack of the most basic supplies—including, for example, soap dispensers in the bathrooms at the women's unit at Mesa Verde, or sufficient soap and personal hygiene items for those at both facilities.[54]

    c. Detainees are responsible for cleaning the communal spaces at Mesa Verde, and plaintiffs have reported that they are denied adequate supplies or time in order to do so effectively.[55] At both facilities, detainees reported that some bathrooms were highly unsanitary and often with noticeable excrement.[56]

    d. Detainees report that when they are cleaning their own areas in the detention centers, or communal areas, they are not given adequate protective equipment.[57]

39. I also understand that there have been serious complaints voiced about the adequacy of medical care provided to detainees at these facilities independent of the COVID-19 pandemic, which raises concerns about the ability of the facilities to provide adequate medical care in the more challenging context of the current pandemic.[58]

40. I note from the declarations of Plaintiffs, there is not a consistent practice of testing and/or quarantining new entrants to the facilities.[59] There continue to be new entrants, which in and of itself raises concerns about the introduction of COVID-19 into the facilities, and these new arrivals are not placed in quarantine or monitored for 14 days.

41. I understand that there has been no, or virtually no, testing for COVID-19 at either facility. From the declarations of Plaintiffs, I understand that detainees with symptoms, including medically vulnerable detainees, are reporting that they are not being tested.[60] Some but not all detainees, in some but not all units of the two facilities, report more regular temperature checks but these remain inconsistent, and in some instances require detainees to stand in line without adequate social distancing.[61] The lack of testing, and even consistent and safe temperature checks, raises concerns about their care, about the availability of tests, and about ICE's adherence to CDC guidance.

42. There also is evidence that there are not sufficient protections for those who are medically vulnerable; they remain in large dormitory settings without social distancing.[62]

---

[54] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 14; Declaration of Lawrence Kuria Mwaura, paras. 30, 34; Declaration of Coraima Yaritza Sanchez Nuñez, para. 11; Declaration of Coraima Yaritza Sanchez Nuñez, para. 18.

[55] *See, e.g.*, Declaration of Dung Tuan Dang, para. 16; Declaration of Javier Alfaro, para. 23; Declaration of Coraima Yaritza Sanchez Nuñez, para. 12.

[56] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, paras. 15, 17; Declaration of Lawrence Kuria Mwaura, para. 15.

[57] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, para. 21.

[58] Kavanagh Declaration, paras. 14-15 (Yuba); Knox Declaration, paras. 4-5 (Mesa Verde). *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, paras. 18, 22.

[59] Declaration of Javier Alfaro, para. 30 (new entrants not quarantined at Mesa Verde); Declaration of Lawrence Kuria Mwaura, para. 11 (new entrants not quarantined at Yuba); Declaration of Coraima Yaritza Sanchez Nuñez, para. 16.

[60] *See, e.g.*, Declaration of Brenda Rubi Ruiz Tovar, paras. 7-13.

[61] *See, e.g.*, Declaration of Javier Alfaro, para. 29 (no regular temperature checks at Mesa Verde); Declaration of Lawrence Kuria Mwaura, paras. 18-19 (inconsistent temperature checks at Yuba).

[62] *See, e.g.*, Declaration of Javier Alfaro, para. 19.

43. As noted above, there is a dramatically increased risk of rapid infectious spread at congregate facilities such as ICE detention centers, and there continue to be serious deficiencies in ICE's policy in response to COVID-19. In addition, however, the structure and facilities of the Mesa Verde Detention Center and the Yuba County Jail lead me to conclude that social distancing is impossible at either facility, and there is a serious risk of infection for all of those who are detained. The close proximity of the sleeping arrangements is one problem, but the fact that there is no ability to practice social distancing at mealtimes, recreation, or in using the shower or bathroom amplifies dramatically the risks. The lack of adequate sanitation and hygiene, as reported, further increases the risks to detainees, staff and other personnel, and the broader community.

**ICE Has Failed to Adequately Respond to COVID-19 at Immigration Detention Facilities**

44. ICE's response to the COVID-19 pandemic, both nationally and at individual facilities including the Mesa Verde and Yuba County ICE detention centers, is deficient, putting detainees, especially those who are high-risk, in imminent danger of serious illness and death.

45. Infection with the virus that causes COVID-19 is widespread across the United States. A disease model devised by University of Texas researchers concludes that, by the time an individual county has just *two* known COVID-19 cases, there is a 70% likelihood that a "sustained, undetected outbreak – an epidemic – is already taking place" in the community, and that probability of an existing epidemic rises to 95% if a county has 10 known COVID-19 cases and 99% if the county has 20 or more cases.[63][64] As of April 18, 2020, Yuba and Sutter Counties has 40 confirmed cases,[65] and Kern County has 610 confirmed cases of COVID-19.[66] Immediate intervention is necessary to avert preventable deaths at detention facilities located in these or other counties where there is a demonstrated probability of a present epidemic.

46. Based on my training and decades of experience in public health, I conclude that although ICE's April 10 Guidance is a marked improvement over its past COVID guidance documents, ICE's COVID protocols fall short of what is needed to address the threats posed to high-risk immigrant detainees by COVID-19, and are likely very challenging for facilities, especially those with reduced staff, to successfully implement. Further, as elaborated above, even the April 10 Guidance is not being implemented at Mesa Verde and Yuba County Jail.

---

[63] Javan, Fox, & Myers. Probability of current COVID-19 Outbreaks in All U.S. Counties, https://cid.utexas.edu/sites/default/files/cid/files/covid-risk-maps_counties_4.3.2020.pdf?m=1585958755, accessed April 16, 2020.
[64] N.Y. Times, *Does My County Have an Epidemic? Estimates Show Hidden Transmission* (Apr. 3, 2020), https://www.nytimes.com/interactive/2020/04/03/us/coronavirus-county-epidemics.html.
[65] "Coronavirus Updates for Yuba County," at https://www.yuba.org/coronavirus/ (accessed Apr. 18, 2020).
[66] Tracking Coronavirus in California," LA Times, at https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (accessed Apr. 18, 2020).

47. **Social Distancing**: ICE recognizes social distancing is an important mitigation measure but fails to mandate it in its facilities. Indeed, ICE's April 10 Guidance acknowledges that there are limits to the amount of social distancing that can be accomplished due to the infrastructure of ICE facilities. ICE facilities have fixed architecture and are designed as congregate settings, requiring close proximity in confined spaces. The measures outlined in ICE's April 10 Guidance are impossible to carry out given the limits of the infrastructure.

   a. ICE's April 10 Guidance suggests that facilities should stagger detainee access to recreation, law library, and meals, so that they encounter fewer other people throughout the course of their day, especially people from other housing units. However, even these steps fall well short of what is needed to actually prevent the transmission of COVID-19, especially in light of crowding within housing units.

   b. ICE's April 10 Guidance acknowledges that social distancing may not be possible. It says that beds should be rearranged, but only "if practicable," and that six feet of distance should be maintained, but only "whenever possible." The ICE Website Guidance similarly identifies social distancing reforms at individual facilities as optional. Individuals at immigration detention facilities have described how it is impossible to stay six feet away from someone during congregate meals, in shared bathrooms and recreation spaces, and in cells with bunk beds.

48. **Release:** Most significantly, ICE fails to appreciate the importance of releasing detainees to limit the risk for the individuals released, for those who remain detained, and for the general public. Because of the risks inherent in detention centers, and the unparalleled importance of social distancing, release is the most important means of mitigating the spread of COVID-19 in ICE detention centers. This would be true even if the conditions inside the facility were impeccable.

   a. ICE's April 10 Guidance says that ICE should reduce its facilities to 75% capacity. ICE's Website Guidance uses a goal of 70% capacity. This is an arbitrary number, particularly since facility design and ventilation varies considerably across the country. ICE provides no evidence that 70% or 75% capacity would facilitate effective social distancing within dormitories or cells, which requires that individuals maintain six feet of separation. In fact, from what I know of most of the ICE facilities, the 70% or 75% figures are not just arbitrary but also inadequate; ICE would need to downsize far more significantly in order to limit the risks of coronavirus for those detained, and for the broader community.

   b. Detention centers are extraordinarily high-risk environments for the transmission of infectious diseases. Thus, the "capacity" of a facility is not an appropriate marker for the facility's ability to house people safely during the COVID-19 pandemic. This is because the facility's capacity does not take into account the need for social distancing in mitigating the COVID-19 pandemic. Social distancing of six feet, as recommended by the CDC, will be impossible without significant downsizing.

49. **Identifying High-Risk Individuals:** ICE's April 10 Guidance directs jails and ICE detention facilities to identify all detainees who meet the Center for Disease Control and Prevention's ("CDC") identified criteria for people at especially high risk for serious illness from coronavirus. The April 10 Guidance does not, however, fully account for high-risk factors, or identify or requires steps to be taken to protect those who are at high risk.

    a.  The April 10 Guidance does not identify pregnancy, the postpartum period or history of smoking as risk factors. The guidance fails to include hypertension as a risk factor. Even though hypertension has been recognized by the CDC as among the "risk factors for severe illness."[67] The ICE guidance also defines obesity as a BMI of 40 or more, though in an April 8, 2020 CDC Morbidity and Mortality Weekly Report ("MMWR"), obesity (a BMI of 30 or more) was the second most common underlying medical condition amongst hospitalized COVID-19 cases, behind hypertension. 48.3% of hospitalized COVID-19 patients have a BMI over 30, and are therefore obese according to the CDC.[68]

    b.  The April 10 guidance provides 65 years of age as the cutoff age for higher-risk individuals despite that the risk of severe COVID-19 begins to increase markedly for individuals earlier, with studies showing significant increased risk of morbidity and mortality for people in their 50s, and risks increasing already for people in their 40s.[69]

    c.  ICE's April 10 Guidance does not identify steps that protect high-risk detainees from getting COVID-19. The guidance only requires that ICE identify these individuals, their underlying medical issues, and their location. There are no requirements to release or otherwise protect these individuals. At most, detainees who are vulnerable because they fall into a higher risk category are "cohorted," which means that they are assigned to shared living quarters or quarantined as a group, which actually facilitates transmission among high risk patients in the absence of adequate social distancing and access to proper hygiene. Since there are no heightened protections for high risk individuals, it is unlikely that illness will be detected until it is too late for preventive intervention.

50. **Transfers:** The April 10 Guidance discourages but does not prohibit transfers. It requires only that transfers of the "detained non-ICE populations" be limited "where possible." It does not limit the transfer of ICE detainees at all. The April 10 Guidance does not require

---

[67] CDC, "Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease," dated March 30, 2020 https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[68] *See* Shikha Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020,* CENTERS FOR DISEASE CONTROL & PREVENTION (Apr. 8, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w#T1_down.
[69] Robert Varity et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis,* THE LANCET, (Mar. 30, 2020); World Health Organization, "Coronavirus Disease 2019: Situation Report—51," Mar. 11, 2020, at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.

the quarantining of new arrivals, but only that "considerable effort" be made to quarantine new entrants. Even where quarantining is considered, the Guidance instructs only "the most effective cohorting methods practicable based on the individual facility characteristics." Transferring individuals between facilities, a common ICE practice, is medically inappropriate during the outbreak.

    a. The lack of automatic isolation or quarantining of new arrivals introduces considerable health risks. Nearly every person who newly arrives at the detention facility will have had close contact to someone with COVID-19. Thus, appropriate guidelines would quarantine and monitor all new arrivals. The isolation and quarantine procedures by ICE do not comply with best practice.

51. **Screening New Detainees:** ICE's April 10 Guidance does not address how facilities will account for large numbers of people who have already been exposed to COVID-19, including transfers. Not only do new detainees need to be accounted for, but also staff, vendors, and other people who go in and out of the facility.

    a. ICE's April 10 Guidance says that people without symptoms, but who have had contact with someone with COVID-19 or those who meet the epidemiological risk criteria will be quarantined and monitored for 14 days. But this does not recognize the scope of the current crisis. A large share of newly arriving individuals will have had contact with someone with COVID-19 or will have been in areas of community spread, including transfers from other facilities. ICE would need to use this level of individual monitoring for each and every person arriving at the facility. ICE would have to increase its medical resources to provide this level of care to this many people, but has not indicated that it has the capacity to do so.

    b. ICE's April 10 Guidance does not account for asymptomatic transmission of COVID-19. "Because persons with asymptomatic and mild disease . . . are likely playing a role in transmission and spread of COVID-19 in the community, social distancing and everyday preventive behaviors are recommended for persons of all ages to slow the spread of the virus, protect the health care system from being overloaded, and protect older adults and persons of any age with serious underlying medical conditions."[70] In fact, half of individuals who tested positive for coronavirus had mild or no symptoms in some studies.[71]

52. **Testing:** Neither ICE's April 10 Guidance nor ICE's Website Guidance address the paucity of testing in their facilities. ICE's Website Guidance only includes a cursory mention that "ICE testing . . . complies with CDC guidance." Much of the ICE COVID Guidance relies on what to do with "confirmed" cases among either detainees or staff. However, without explicit testing criteria and actual testing, ICE will not be able to

---

[70] *See Coronavirus Disease 2019 in Children — United States, February 12–April 2, 2020*, CENTERS FOR DISEASE CONTROL & PREVENTION (Apr. 20, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e4.htm?s_cid=mm6914e4_w.
[71] *See* Pien Huang, *What We Know About The Silent Spreaders Of COVID-19*, NATIONAL PUBLIC RADIO (Apr. 13, 2020), https://www.npr.org/sections/goatsandsoda/2020/04/13/831883560/can-a-coronavirus-patient-who-isnt-showing-symptoms-infect-others.

identify "confirmed" cases within its facilities. To say that there are no "confirmed" cases in a facility in no way implies that the facility is "clean" of the virus when there has been little or no testing.

53. **Staff:** ICE's April 10 Guidance does not provide criteria for when staff should be tested, and does not require the testing of staff who interact with detainees. Staff, vendors and other non-detained personnel are especially important vectors in this outbreak. Since they go back and forth between the outside world, detention centers will be hit by COVID-19 when the rest of the community is, staff and their families included. Despite this, ICE COVID procotols do not provide meaningful guidance for screening and testing these personnel.

   a. The April 10 Guidance provides that staff should "stay home when sick," have their temperature checked, and "inform their workplace" if they test positive. The Guidance provides that staff must not be admitted if they are symptomatic. But there is no recognition of the lack of available testing or the risk of asymptomatic transmission.

   b. Monitoring active symptoms, including fever, is important. To limit the spread of the virus, however, ICE policy must also recognize the significance of the spread of COVID-19 from *asymptomatic* individuals. An individual can present without a fever or respiratory problems and still be infected and infectious. There are many more COVID-19 cases than are confirmed.

   c. The April 10 Guidance also provides no guidance with regard to limiting the risk of exposure from contractors and vendors. This is not enough to guard against staff or vendors introducing COVID-19 into these facilities, particularly as they may be infected but asymptomatic.

54. **Medical Isolation for Confirmed COVID Cases:** The April 10 Guidance recognizes the CDC guidance that confirmed COVID-19 cases should be medically isolated. However, many facilities only have one to four of these rooms available in the facility. Based on the experience of detention and other congregate facilities, and the trajectory of this virus, as soon as there are infections at the detention facility, if there are not already, there will be many more than one to four people with COVID-19 in the detention center at a time. Symptomatic patients should live separately from those who are asymptomatic or at risk but who do not have confirmed cases, but in my experience, the structure of detention centers makes this nearly impossible.

55. **Cohorting:** ICE's April 10 Guidance acknowledges that confirmed cases should not be confined with suspected cases or close contacts. However, it doesn't say how social distancing will occur within cohorts of suspected cases or close contacts. Cohorting necessarily means that people will be in close contact with other individuals who may be infected. The April 10 Guidance concerning cohorting again does not take into account that there is very limited testing available and conducted in immigration detention facilities.

a. The ICE Website Guidance states that "cohorting serves as an alternative to self-monitoring at home." But this is contrary to the guidance of the CDC. The CDC identifies "cohorting" as a suboptimal practice of group quarantining. Where cohorting can be an effective mitigation strategy in the absence of sufficient space for medical isolation, it requires adequate space for appropriate groupings. For instance, confirmed cases should not be in the same cohort as suspected cases or case contacts; those who had contact with an infected person ten days ago should not be in the same cohort as someone who had contact with an infected person two days ago. Any new arrival should be assumed to have had exposure to coronavirus and thus adding any new individual to an existing cohort requires the 14-day monitoring period to begin anew.

b. Appropriate cohorting is likely impossible based upon the staffing and space constraints inherent in ICE detention. The detention facility's medical unit simply cannot handle the volume of patients that would need this level of monitoring. ICE COVID protocols do not mention any way to accommodate such a level.

56. **Isolation for Those *Without* Confirmed COVID:** Isolation is not a proper solution for people without symptoms or confirmed disease. Detainees who are isolated are monitored less frequently. If they develop COVID-19 symptoms, or their symptoms escalate, they may not be able to get the medical attention they desperately need in a timely fashion. It also makes it more likely that these detained people will attempt suicide or self-harm, giving rise to more medical problems in the midst of a pandemic. Isolation also increases the amount of physical contact between staff and detained people—in the form of increased handcuffing, escorting individuals to and from the showers, and increased use of force due to the increased psychological stress of isolation. My expert opinion is that the use of isolation or lockdown is not a medically appropriate method for abating the substantial risks of COVID-19.

57. Nothing in the April 10 Guidance has changed my conclusion that COVID-19 will likely spread rapidly throughout immigration detention facilities, and specifically at Mesa Verde Detention Center and Yuba County Jail.

## Conclusions

58. Given the lack of testing, known periods of infection without symptoms and the likelihood of virus transmission from people who do not have symptoms, every congregate setting should expect infection within the facility. Intramural transmission is highly likely. The facilities, living arrangements, and sanitation and hygiene practices at both Mesa Verde and Yuba lead me to conclude that these facilities have a very high risk of infection, if there is not infection already at the facilities.

59. The facilities fail to meet minimally acceptable standards of social distancing, putting the residents at grave and unacceptable risk of pervasive infections, leading to serious illness and death. The only way to avoid these unacceptable risk is to materially reduce the

population, implement social distancing as described herein, and ensure appropriate hygiene.

60. Releasing individuals, and prioritizing the most vulnerable, reduces the burden on local health care resources, as it reduces the risk of transmission of the disease to a large number of people living in close proximity for an extended period of time. It also reduces the risk of transmission to staff. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of individuals, prioritizing the most medically vulnerable individuals, is a key part of a risk mitigation strategy. In my opinion, as a matter of public health it is imperative to release significant numbers of people from detention at the immigration detention centers at Mesa Verde and Yuba County Jail, prioritizing those who are most vulnerable, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

61. Any suggestion that the moment for medically necessary interventions, including release, arrives only when a case of COVID-19 has been confirmed inside an ICE detention facility is wrong, without any basis in medical science, and is dangerous.

62. Based on my experience working on health care in detention facilities and my review of the literature concerning the coronavirus, for the reasons outlined in this declaration, it is my opinion that immigration detention facilities at Mesa Verde and Yuba are not prepared to prevent the spread of COVID-19, treat those who are most medically vulnerable, and contain any outbreak. The risk of transmission of infection at each of these facilities is very high.

63. Immigration detention centers are not equipped to care for those who are severely affected by COVID-19. If individuals are not released, care for those who become sick with COVID-19 will overburden the limited health care resources of the detention center and the broader community.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day in April, 2020 in New York City, New York.

Robert B. Greifinger, M.D.

# ROBERT B. GREIFINGER, M.D.

380 Riverside Drive, Apt 4F       (646) 559-5279
New York, New York 10025       bob@rgreifinger.com

Physician consultant with extensive experience in development and management of complex community and institutional health care programs. Demonstrated strength in leadership, program development, negotiation, communication, operations and the bridging of clinical and public policy interests. Teacher of health and criminal justice.

## SUMMARY OF EXPERIENCE

**MEDICAL MANAGEMENT AND QUALITY IMPROVEMENT SERVICES**       1995-Present

Consultant on the design, management, operations, quality improvement, and utilization management for correctional health care systems.

- Recent clients include (among others) the U.S. Department of Justice Civil Rights Division, monitoring multiple correctional systems and the U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties. Federal court monitor for the Metropolitan Detention Center, Albuquerque, New Mexico, Orleans Parish Sheriff's Office, New Orleans, Louisiana, and Miami-Dade Corrections and Rehabilitation Department.

- National Commission on Correctional Health Care. Principal Investigator for an NIJ funded project to make recommendations to Congress on identifying public health opportunities in soon-to-be-released inmates.

- Associate Editor, Puisis M (ed), Clinical Practice in Correctional Medicine, Second Edition, St. Louis. Mosby 2006.

- Editor, Greifinger, RB (ed), Public Health Behind Bars: From Prisons to Communities, New York. Springer 2007.

- John Jay College of Criminal Justice. Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow 2005 – 2016.

- Co-Editor, International Journal of Prison Health 2010 – 2016.

**NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES**       1989 - 1995

Operating budget of $1.4 Billion. Responsible for inmate safety, program, and security. Sixty-nine facilities housing over 68,000 inmates with 30,000 employees.

Deputy Commissioner/Chief Medical Officer, 1989 - 1995

- Operating budget of $140 million; health services staff of 1,100. Accountable for inmate health services and public health. Directed major initiatives in policy and program development, quality and utilization management.

- Developed and implemented comprehensive program for HIV prevention, surveillance, education, and treatment in nation's largest AIDS medical practice.

- Managed the rapid implementation of an infection control program responding to a major outbreak of multidrug-resistant tuberculosis. Helped bring the nation's tuberculosis epidemic to public attention.

- Developed $360 million five-year capital plan for inmate health services. Opened the first of five regional medical units for multispecialty ambulatory and long-term care.

- Implemented a centralized and regional pharmacy system, improving quality, service and cost management.

# ROBERT B. GREIFINGER, M.D.

**MONTEFIORE MEDICAL CENTER**, Bronx, NY                                    1985 - 1989

A major academic medical center with 8,000 employees and annual revenue of $500 million.

Vice President, Health Care Systems, 1986 - 1989

Director, Alternative Delivery Systems, 1985 - 1986

Operating budget of $60 million with 1,100 employees.  Managed a multi-specialty group, a home health agency, and prison health programs.

- Negotiated contracts, including bundled service, risk capitation, fee-for-service arrangements, and major service contracts.  Developed a high technology home care joint venture.

- Taught epidemiology and health care organization at Albert Einstein College of Medicine.  Lectured nationally on health care delivery and managed care.

- Conceived and collaborated in development of a consortium of six academic medical centers, leading to a metropolitan area-wide, joint venture HMO.  Organized a network of physicians to contract with HMO's preparing for cost-containment.

**WESTCHESTER COMMUNITY HEALTH PLAN**, White Plains, NY          1980 - 1985

Independent, not-for-profit, staff-model HMO, acquired by Kaiser-Permanente in 1985.   Operating revenue $17 million with 200 employees and 27,000 members.

Vice President and Medical Director

Chief medical officer and COO.  Managed the delivery of comprehensive medical services.  Accountable to the Board of Directors for quality assurance and utilization management. Practiced pediatrics.

- Accomplished turnaround with automated utilization management, improved service, sound personnel management principles, and quality management programs.

- Implemented performance based compensation program.

**COMMUNITY HEALTH PLAN OF SUFFOLK, INC.**                                 1977 - 1980

Community based, not-for-profit, staff model HMO, with enrollment of 18,000.

Medical Director

- Developed and operated clinical services.  Accountable for quality of care.  Practiced clinical pediatrics, and taught community health and medical ethics at SUNY Stony Brook School of Medicine.

**MONTEFIORE MEDICAL CENTER**, Bronx, NY                                    1976 - 1977

Residency Program in Social Medicine, Deputy Director, 1976-1977

Unique clinical training program focused on community health and change agentry.  Developed curriculum and supervised 40 residents in internal medicine, pediatrics and family medicine.

**UNITED STATES PUBLIC HEALTH SERVICE**                                    1972 - 1974

Commissioned officer in the National Health Service Corps.  Functioned as medical director and family physician in a federally funded neighborhood health center in Rock Island, Illinois.  Honorable Discharge.

# ROBERT B. GREIFINGER, M.D.

## FACULTY APPOINTMENTS

1976 - 2002
> Assistant Professor of Epidemiology and Social Medicine, Albert Einstein College of Medicine

2005 - 2016
> Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow, John Jay College of Criminal Justice

## NATIONAL COMMITTEE FOR QUALITY ASSURANCE

Worked with NCQA since its inception in 1980. Began training surveyors in 1989, and continued as faculty for NCQA sponsored educational sessions. Served for six years as a charter member of the Review Oversight (accreditation) Committee. Served on the Reconsideration (appeals) Committee for six years. Surveyed dozens of managed care organizations, and reviewed several hundred quality management programs.

## OTHER PROFESSIONAL ACTIVITIES

2012 – present   Member, Board of Directors, Prison Legal Services, New York

2012 – present   Member, Board of Directors, National Health Law Program

2011 – 2015   Member, Board of Directors, Academic Consortium of Criminal Justice Health

2010 - 2016   Co-editor, International Journal of Prisoner Health

2009   Recipient, B. Jaye Anno Award for Lifetime Achievement in Communication

2007-2015   Member, National Advisory Group on Academic Correctional Health Care

2007   Recipient, Armond Start Award, Society of Correctional Physicians

2005 - 2011   Member, Advisory Board to the Prisoner Reentry Institute, John Jay College

2002 - present   Member, Editorial Board, Journal of Correctional Health Care

2002 - present   Peer reviewer for multiple journals, including Journal of Correctional Health Care, International Journal of Prison Health, Journal of Urban Health, Journal of Public Health Policy, Annals of Internal Medicine, American Journal of Public Health, Health Affairs, and American Journal of Drug and Alcohol Abuse.

2001 - 2003   Member, Advisory Board to CDC on Prevention of Viral Hepatitis in Correctional Facilities

1999 - 2003   Member, Advisory Board to CDC on Prevention and Control of Tuberculosis in Jails

1997 - 2003   Member, Reconsideration Committee, NCQA

1997 - 2001   Moderator, Optimal Management of HIV in Correctional Systems, World Health Communications

1997 - 2000   Member, Reproductive Health Guidelines Task Force, CDC

1993 - 1995   Co-chair, AIDS Clinical Trial Community Advisory Board, Albany Medical Center

1992 - Present   Society of Correctional Physicians

1991 - 1997   Member, Review Oversight (accreditation) Committee, NCQA

## ROBERT B. GREIFINGER, M.D.

| 1983 - 1985 | Executive Committee, Medical Directors' Division, Group Health Association of America (Secretary, 1984-1985) |

### EDUCATION

University of Pennsylvania, College of Arts and Sciences, Philadelphia; B.A., 1967 (Amer. Civilization)

University of Maryland, School of Medicine, Baltimore; M.D., 1971

Residency Program in Social Medicine (Pediatrics), Montefiore Medical Center, Bronx, NY; 1971-1972, 1974-1976, Chief Resident 1975-1976

### CERTIFICATION

Diplomate, National Board of Medical Examiners, 1971

Diplomate, American Board of Pediatrics, 1976

Fellow, American Academy of Pediatrics, 1977

Fellow, American College of Physician Executives, 1983

Fellow, American College of Correctional Physicians (formerly Society of Correctional Physicians), 2000

License:  New York, Pennsylvania (inactive)

# ROBERT B. GREIFINGER, M.D.

Updated February 2018

PUBLICATIONS

Greifinger RB, A Summer Program in Life Sciences.  Journal of Medical Education 1970; 45: 620-622.

Greifinger RB, Sidel VW, American Medicine - Charity Begins at Home.  Environment 1977; 18(4): 7-18.

Greifinger RB, An Encounter With the System.  The New Physician 1977; 26(9): 36-37.

Greifinger RB, Sidel VW, Career Opportunities in Medicine.  In Tice's(eds) Practice of Medicine.  Hagerstown: Harper & Row 1977; 1(12): 1-49.

Greifinger RB, Grossman RL, Toward a Language of Health.  Health Values 1977; 1(5): 207-209.

Grossman RL, Greifinger RB, Encouraging Continued Growth in the Elderly.  In Carnevali DL & Patrick M (eds), Nursing Management for the Elderly. Philadelphia: Lippincott 1979: 543-552.

Greifinger RB, Jonas S, Ambulatory Care.  In Jonas S (ed), Health Care Delivery in the United States (second edition). New York: Springer 1980: 126-168.

Greifinger RB, Toward a New Direction in Health Screening.  In Health Promotion: Who Needs It?  Washington: Medical Directors Division, Group Health Association of America 1981: 61-67.

Greifinger RB, Sidel VW, American Medicine.  In Lee, Brown & Red (eds), The Nation's Health.  San Francisco: Boyd & Fraser 1981: 122-134.

Greifinger RB, Bluestone MS, Building Physician Alliances for Cost-Containment.  Health Care Management Review 1986: 63-72.

Greifinger RB, An Ethical Model for Improving the Patient-Physician Relationship.  Chicago: Inquiry 1988: 25(4): 467-468.

Glaser J, DeCorato DR, Greifinger RB, Measles Antibody Status of HIV-Infected Prison Inmates.  Journal of Acquired Immunodeficiency Syndrome 1991; 4(5): 540-541.

Ryan C, Levy ME, Greifinger RB, et al, HIV Prevention in the U.S. Correctional System, 1991.  MMWR 1992; 41(22): 389-397.

Greifinger RB, Keefus C, Grabau J, et al, Transmission of Multidrug- resistant Tuberculosis Among Immunocompromised Persons in a Correctional System.  MMWR 1992; 41(26): 509-511.

Greifinger RB, Tuberculosis Behind Bars, in Bruce C Vladeck ed, The Tuberculosis Revival:  Individual Rights and Societal Obligations In a Time of AIDS.  New York: United Hospital Fund 1992: 59-65.

Bastadjian S, Greifinger RB, Glaser JB. Clinical characteristics of male homosexual/bisexual HIV-infected inmates. J AIDS 1992;5:744-5.

Glaser JB, Greifinger R. Measles antibodies in HIV-infected adults. J Infect Dis. 1992 Mar;165(3):589.

Glaser J, Greifinger RB, Correctional Health Care:  A Public Health Opportunity.  Annals of Internal Medicine 1993; 118(2): 139-145.

Greifinger RB, Glaser JG and Heywood NJ, Tuberculosis In Prison:  Balancing Justice and Public Health, Journal of Law, Medicine and Ethics 1993; 21 (3-4):332-341.

# ROBERT B. GREIFINGER, M.D.

Valway SE, Greifinger RB, Papania M et al, Multidrug Resistant Tuberculosis in the New York State Prison System, 1990-1991, Journal of Infectious Disease 1994; 170(1):151-156.

Wolfe P, Greifinger RB, Prisoners in Service of Public Health: Focus New York State.  New York Health Sciences Journal 1994 1(1):35-43.

Valway SE, Richards S, Kovacovich J, Greifinger RB et al, Outbreak of Multidrug-Resistant Tuberculosis in a New York State Prison, 1991.  American Journal of Epidemiology 1994 July 15; 140(2):113-22.

Smith HE, Smith LD, Menon A and Greifinger RB, Management of HIV/AIDS in Forensic Settings, in Cournos F(ed), AIDS and People with Severe Mental Illness: A Handbook for Mental Health Professionals. New Haven: Yale Press 1996.

Greifinger RB, La Plus Ca Change . . ., Public Health Reports 1996 July/August; 111(4):328-9.

Greifinger RB, TB and HIV, Health and Hygiene 1997;18,20-22.

Greifinger RB, Horn M, "Quality Improvement Through Care Management," chapter in Puisis M (ed), Clinical Practice in Correctional Medicine, St. Louis: Mosby 1998.

Greifinger RB, Glaser JM, "Desmoteric Medicine and the Public's Health," chapter in Puisis M (ed), Clinical Practice in Correctional Medicine, St. Louis: Mosby 1998.

Greifinger RB, Commentary: Is It Politic to Limit Our Compassion? Journal of Law, Medicine & Ethics, 27(1999):213-16.

Greifinger RB, Glaser JG and Heywood NJ, "Tuberculosis In Prison:  Balancing Justice and Public Health," chapter in Stern V (ed), Sentenced to die? The problem of TB in prisons in Eastern Europe and Central Asia, London: International Centre for Prison Studies, 1999.

Greifinger RB (Principal Investigator).  National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002. http://www.ncchc.org/pubs_stbr.html.

Kraut JR, Haddix AC, Carande-Kulis V and Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails. National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002. http://www.ncchc.org/stbr/Volume2/Report5_Kraut.pdf.

Hornung CA, Greifinger RB, and Gadre S, A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population. National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report3_Hornung.pdf.

Hornung CA, Anno BJ, Greifinger RB, and Gadre S, Health Care for Soon-to-be-Released Inmates: A Survey of State Prison Systems," National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report1_Hornung.pdf.

Patterson RF & Greifinger RB, Insiders as Outsiders:  Race, Gender and Cultural Considerations Affecting Health Outcome After Release to the Community, Journal of Correctional Health Care 10:3 2003; 399-436.

Howell E & Greifinger RB, What is Known about the Cost-Effectiveness of Health Services for Returning Inmates? Journal of Correctional Health Care 10:3 2003; 437-455.

Kraut JR, Haddix AC, Carande-Kulis V & Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails, J Urban Health:

# ROBERT B. GREIFINGER, M.D.

Bulletin of the New York Academy of Medicine 2004: 81(3):453-471. (Finalist, Charles C. Shepard Science Award)

Greifinger RB. Health Status in U.S. and Russian Prisons: More in Common, Less in Contrast. Journal of Public Health Policy 2005 26:60-68. http://www.palgrave-journals.com/cgi-taf/DynaPage.taf?file=/jphp/journal/v26/n1/full/3200003a.html&filetype=pdf

Greifinger RB. Health Care Quality Through Care Management, M. Puisis (ed). Clinical Practice in Correctional Medicine, Second Edition. St. Louis. Mosby 2006: pp. 510-519.

Greifinger RB. Pocket Guide Series on tuberculosis, HIV, MRSA, sexually transmitted disease, viral hepatitis and management of outbreaks. See http://www.achsa.org/displaycommon.cfm?an=1&subarticlenbr=23

Greifinger RB. Inmates are Public Health Sentinels. Washington University Journal of Law and Policy. Volume 22 (2006) 253-64.

Greifinger RB. Disabled Prisoners and "Reasonable Accommodation." Journal of Criminal Justice Ethics. Winter Spring 2006: 2, 53-55.

Mellow J, Greifinger RB. Successful Reentry: The Perspective of Private Health Care Providers. Journal of Urban Health. November 2006 doi:10.1007/s11524-006-9131-9.

Mellow J, Greifinger RB. The Evolving Standard of Decency: Post-Release Planning? Journal of Correctional Health Care January 2008 14(1):21-30.

Williams B, Greifinger RB. Elder Care in Jails and Prisons: Are We Prepared? Journal of Correctional Health Care January 2008 14(1):4-5.

Greifinger RB (editor). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Greifinger RB. Thirty Years Since Estelle v. Gamble: Looking Forward Not Wayward. Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Patterson RF, Greifinger RB. Treatment of Mental Illness in Correctional Settings. Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

MacDonald M, Greifinger RB. and Kane D. Use of electro-muscular disruption devices behind bars: Progress or regress. Editorial',International Journal of Prisoner Health,4:4,169 — 171. 2009.

Hoge SK, Greifinger RB, Lundquist T, Mellow J. Mental Health Performance Measurement in Corrections. International Journal of Offender Therapy and Criminology, 53:6 634-47, 2009. Abstract accessed January 12, 2010 at http://www.ncjrs.gov/App/Publications/abstract.aspx?ID=251100.

Williams BA, Lindquist K . . . Greifinger RB et al. Caregiving Behind Bars: Correctional Officer Reports of Disability in Geriatric Prisoners. J Am Geriatr Soc 57:1286–1292, 2009.

Baillargeon J, Williams B . . . Greifinger RB, et al. Parole Revocation among Prison Inmates with Psychiatric and Substance Use Disorders. Psychiatric Services 60:11: 1516-21, 2009.

Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

Stern MF, Greifinger RB, Mellow J. Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Public Health. Nov 2010; 100: 2103 - 2110.

Blair P, Greifinger R, Stone TH, & Somers S. Increasing Access to Health Insurance Coverage for Pre-trial Detainees and Individuals Transitioning from Correctional Facilities Under the Patient

# ROBERT B. GREIFINGER, M.D.

Protection and Affordable Care Act. American Bar Association. Accessed on March 23, 2011 at
http://www.cochs.org/files/ABA/aba_final.pdf

Williams BA, Sudore RL, Greifinger R, Morrison RS. Balancing Punishment and Compassion for
Seriously Ill Prisoners. Ann Int Med 2011; 155:122-126.

Weilandt C, Greifinger RB , Hariga F. HIV in Prison: New Situation and Risk Assessment Toolkit. Int. J.
Prisoner Health 2011; 7(2/3):17-22.

Williams, B., Stern, M., Mellow, J., Safer, M., Greifinger, RB. Aging in correctional custody: Setting a policy
agenda for older prisoner health. Am J Public Health. Published online ahead of print June 14, 2012: e1–
e7. doi:10.2105/AJPH.2012.300704.

Greifinger, RB. Independent review of clinical health services for prisoners. Int. J. Prisoner Health 2012;
8(3/4):141-150.

Greifinger RB. Facing the facts, Int J Prisoner Health, Vol. 8 (3/4) (editorial).

Greifinger, RB. The Acid Bath of Cynicism. Correctional Law Reporter June/July 2013: 3, 14, 16.

Ahalt C, Trestman RL, Rich JD, Greifinger RB, Williams BA. Paying the price: the pressing need for quality, cost
and outcomes data to improve correctional healthcare for older prisoners. J Am Geriatr Soc 61:2013–
2019, 2013.

Williams BA, Ahalt C, Greifinger RB. The older prisoner and complex medical care. Chapter in WHO guide
Prisons and Health. WHO Copenhagen. 2014: 165-170.

Rich JD, Chandler R . .. . Greifinger RB et al. How health care reform can transform the health of criminal
justice-involved individuals. Health Affairs 33, No. 3(2014: -

Allen SA, Greifinger RB. Asserting Control: A Cautionary Tale. International Journal of Prisoner Health 11:3,
2015.

Junod V, Wolff H, Scholten W, Novet B, Greifinger R, Dickson C & Simon O. Methadone versus
torture: The perspective of the European Court of Human Rights. Heroin Addict Relat Clin Probl.
Heroin Addict Relat Clin Probl 2018; 20(1): 31-36.

Pont J, Enggist S, Stover H, Williams B, Greifinger R, Wolff H. Prison Health Care Governance:
Guaranteeing Clinical Independence. Published online ahead of print February 22, 2018.


## ABSTRACTS & RESEARCH PRESENTATIONS

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates
With AIDS. Florence: Seventh International Conference on AIDS 1991 (poster session).

Sherman M, Coles B, Buehler J, Greifinger RB, Smith P, The HIV Epidemic in Inmates. Atlanta: Centers
for Disease Control. 1991

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates
With AIDS, American Public Health Association. 1991 (poster session)

Mikl J, Smith P, Greifinger RB, Forte A, Foster J, Morse D, HIV Seroprevalence of Male Inmates
Entering the New York State Correctional System. American Public Health Association. 1991
(poster session)

Valway SE, Richards S, Kovacovich J, Greifinger R, Crawford J, Dooley SW. Transmission of
Multidrug-resistant Tuberculosis in a New York State Prison, 1991. Abstract No 15-15, In: World
Congress on TB Program and Abstracts, Washington, D.C., November, 1992.

# ROBERT B. GREIFINGER, M.D.

Mikl J, Smith PF, Greifinger RB, HIV Seroprevalence Among New York State Prison Entrants.  Ninth International Conference on AIDS 1993 (Poster Session)

Hornung CA, Greifinger RB, McKinney WP. Projected Prevalence of Diabetes Mellitus in the Incarcerated Population. J Gen Int Med 14 (Supplement 2):40, April 1999.

# Exhibit C

1   WILLIAM S. FREEMAN (SBN 82002)          MANOHAR RAJU (SBN 193771)
    wfreeman@aclunc.org                      Public Defender
2   SEAN RIORDAN (SBN 255752)                MATT GONZALEZ (SBN 153486)
    sriordan@aclunc.org                      Chief Attorney
3   ANGÉLICA SALCEDA (SBN 296152)            GENNA ELLIS BEIER (CA SBN 300505)
    asalceda@aclunc.org                      genna.beier@sfgov.org
4   AMERICAN CIVIL LIBERTIES UNION           EMILOU H. MACLEAN (CA SBN 319071)
    FOUNDATION OF NORTHERN                   emilou.maclean@sfgov.org
5   CALIFORNIA                               FRANCISCO UGARTE (CA SBN 241710)
    39 Drumm Street                          francisco.ugarte@sfgov.org
6   San Francisco, CA 94111                  OFFICE OF THE PUBLIC DEFENDER
    Telephone: (415) 621-2493                SAN FRANCISCO
7   Facsimile: (415) 255-8437                555 Seventh Street
                                             San Francisco, CA 94103
8   *Attorneys for Petitioners-Plaintiffs*   Direct: 415-553-9319
    Additional Counsel Listed on Following Page   Fax:    415-553-9810
9

10                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
11                      SAN FRANCISCO DIVISION

12

13   ANGEL DE JESUS ZEPEDA RIVAS,
     BRENDA RUIZ TOVAR, LAWRENCE
14   MWAURA, LUCIANO GONZALO            **DECLARATION OF SANDRA**
     MENDOZA JERONIMO, CORAIMA          **HERNANDEZ**
15   YARITZA SANCHEZ NUÑEZ, JAVIER
     ALFARO, DUNG TUAN DANG,
16                    Petitioners-Plaintiffs,

17              v.

18   DAVID JENNINGS, Acting Director of the
     San Francisco Field Office of U.S. Immigration
19   and Customs Enforcement; MATTHEW T.
     ALBENCE, Deputy Director and Senior
20   Official Performing the Duties of the Director
     of the U.S. Immigration and Customs
21   Enforcement; U.S. IMMIGRATION AND
     CUSTOMS ENFORCEMENT; GEO GROUP,
22   INC.; NATHAN ALLEN, Warden of Mesa
     Verde Detention Facility,
23
                     Respondents-Defendants.
24

25

26

27
                      DECLARATION OF SANDRA HERNANDEZ
28

1    BREE BERNWANGER* (NY SBN 5036397)        MARTIN S. SCHENKER (SBN 109828)
     bbernwanger@lccrsf.org                    mschenker@cooley.com
2    TIFANEI RESSL-MOYER (SBN 319721)          COOLEY LLP
     tresslmoyer@lccrsf.org                    101 California Street, 5th Floor
3    HAYDEN RODARTE (SBN 329432)               San Francisco, CA  94111
     hrodarte@lccrsf.org                       Telephone: (415) 693-2000
4    LAWYERS' COMMITTEE FOR                    Facsimile: (415) 693-2222
     CIVIL RIGHTS OF
5    SAN FRANCISCO BAY AREA                    TIMOTHY W. COOK (Mass. BBO# 688688)*
     131 Steuart St #400                       tcook@cooley.com
6    San Francisco, CA 94105                   FRANCISCO M. UNGER (Mass. BBO#
     Telephone: (415) 814-7631                 698807)*
7                                              funger@cooley.com
     JUDAH LAKIN (SBN 307740)                  COOLEY LLP
8    judah@lakinwille.com                      500 Boylston Street
     AMALIA WILLE (SBN 293342)                 Boston, MA 02116
9    amalia@lakinwille.com                     Telephone: (617) 937-2300
     LAKIN & WILLE LLP                         Facsimile: (617) 937-2400
10   1939 Harrison Street, Suite 420
     Oakland, CA 94612
11   Telephone: (510) 379-9216
     Facsimile: (510) 379-9219
12
     JORDAN WELLS (SBN 326491)
13   jwells@aclusocal.org
     STEPHANIE PADILLA (SBN 321568)
14   spadilla@aclusocal.org
     AMERICAN CIVIL LIBERTIES UNION
15   FOUNDATION OF SOUTHERN CALIFORNIA
     1313 West Eighth Street
16   Los Angeles, CA 90017
     Telephone: (213) 977-9500
17   Facsimile: (213) 977-5297

18                     *Attorneys for Petitioners-Plaintiffs*
                  *Motion for Admission Pro Hac Vice Forthcoming*
19

20

21

22

23

24

25

26

27
                     DECLARATION OF SANDRA HERNANDEZ
28

**Declaration of Sandra Hernandez**

1.      I am the president and CEO of the California Health Care Foundation, which works to improve health care systems in California. Prior to joining CHCF, I was CEO of The San Francisco Foundation, which I led for 16 years. From 1994 to 1997, I served as Director of Health for the City and County of San Francisco. I also co-chaired San Francisco's Universal Healthcare Council which designed Healthy San Francisco, an innovative health access program for the uninsured.

2.      In February 2018, I was appointed by Governor Jerry Brown to the Covered California Board of Directors. In December 2019, I was appointed by Governor Gavin Newsom to the Healthy California for All Commission. I served on President Bill Clinton's Commission on Consumer Protection and Quality in the Healthcare Industry, and on two Institute of Medicine committees, including one on the Implementation of Antiviral Medication Strategies for an Influenza Pandemic. Since 2017, I have been on the Planning Committee for the Future of Health Services Research at the National Academy of Medicine. I also serve on the University of California Regents Health Services Committee and the University of California-Davis Gordon & Betty Moore School of Nursing National Advisory Committee.

3.      I practiced at San Francisco General Hospital in the HIV/AIDS Clinic from 1984 to 2016 and was an assistant clinical professor at the UCSF School of Medicine. I am a graduate of Yale University, the Tufts School of Medicine, and the certificate program for senior executives in state and local government at Harvard University's John F. Kennedy School of Government.

4.      Attached as Exhibit A is my curriculum vitae.

**A.      Respiratory Spread of COVID-19**

5.      The COVID-19 strain was isolated on January 7, 2020 after the first cases of the 2019 novel coronavirus (SAS-CoV-2) were identified in December 2019. The public health

response in Wuhan, China, where the strain first appeared, was a mass quarantine of 59 million people in Wuhan and surrounding cities in mid-January. By the end of January, the World Health Organization declared the spread of COVID-19 an international public health emergency.

6.   Transmission of COVID-19 is largely through community contact via respiratory spread. Droplets carrying the virus are transmitted primarily through hands and surfaces. As a result, infection control must focus on reducing droplet spread. Studies have shown viral shedding before symptom onset and in asymptomatic patients, suggesting that these individuals are important in disease transmission.

7.   Any publicly reported tally of reported cases and deaths from COVID-19 almost certainly represents an undercount of infections given the constrained availability and accessibility of COVID-19 testing. The overwhelming majority of cases, in the United States and around the world, have resulted from community transmission.

8.   About 5% of patients with COVID-19 will develop acute respiratory distress syndrome (ARDS) and require intensive care. Approximately 20% of infected individuals may need hospitalization for clinical reasons.

**B.   U.S. and California Public Health Response to COVID-19**

9.   Testing capacity for COVID-19 was slow to become available in the United States. It is now increasing in California and across the country but remains insufficient to respond to the need. As testing increases, it is expected that the number of confirmed cases will increase markedly.

10.   There is currently no treatment or vaccine for COVID-19. The clinical response for most individuals with COVID-19 is limited to infection control. Patients with COVID-19 will require isolation and, depending on the severity of symptoms, hospitalization.

11.     Limiting the growth of new cases can be achieved by (1) limiting social contact through social distancing and self-quarantine; (2) limiting the probability of infection during social contacts through, i.e., ensuring personal hygiene and hand-washing, disinfecting frequently touched surfaces and, where appropriate, wearing personal protective equipment; (3) decreasing the infectious period through contact tracing, case isolation, and timely treatment if medication is available; and ultimately (4) reducing population susceptibility to the virus through vaccination.

12.     At this point, given the lack of more widespread community testing, and the lack of available treatments, the only option is mitigation. The most effective mitigation measures are community-wide social distancing.

13.     The public health response to COVID-19 in California has been extensive. The primary goal of the response has been to limit the growth of new cases in order to flatten the outbreak. If effective, this serves to protect limited health care resources and allow time for the development of effective medication and vaccines. Without an intervention, the pandemic will quickly overwhelm the capacity of the health systems to respond to both COVID-19 and other medical needs.

14.     To that end, on March 4, Governor Gavin Newsom declared a state of emergency to make resources available, formalize emergency actions, and assist in state preparations for an anticipated spread of COVID-19.[1] He also used the state's authority to make all medically necessary screening and testing for COVID-19 free for 24 million more California residents.[2] This includes waiving all fees for emergency room, urgent care or provider office visits related to the screening and testing of COVID-19. The state also encouraged health plans to expand telehealth services in order to increase screening and testing capacity.

---

[1] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (accessed Mar. 21, 2020).
[2] See https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-012.aspx (accessed Mar. 21, 2020).

15.     In a March 15 proclamation, Governor Newsom advised all people over the age of 65 to shelter in place; ordered the closure of bars, nightclubs, wineries and brewpubs; decreased restaurant capacity by half to permit social distancing; and severely restricted visitors to long-term care facilities and hospitals. He also announced that 51% of school districts, which represent 80-85% of all students in California, had closed for an extended period. He further expressed the intent of public authorities to procure hotels and motels for homeless people in order to decrease the risk of transmission for the unhoused.

16.     On March 16, seven Bay Area counties issued the first "shelter in place" policies in the country. Three other counties followed. Pursuant to these policies, individuals were directed to severely limit activity, travel and business outside the home. Only essential services, such as health care, police, grocery stores, and gas stations, were exempted. On March 19, Governor Newsom expanded the "shelter in place" policy to the entire state.[3] There are a growing number of shelter in place policies across the country.

17.     COVID-19 remains a serious public health threat in California and nationwide. However, as of today, these public health measures adopted in California appear to have been effective in "flattening the curve," or reducing the rate of increase of infections and deaths, in the state. Although California was one of the earliest states to experience a significant number of cases and deaths, it now ranks relatively low among the states in terms of infections and deaths as a percentage of the population.

18.     There have been COVID-19 cases reported in Kern and Yuba Counties, the sites of the Mesa Verde and Yuba immigration detention centers, respectively. As of April 18, 2020, there are 610 confirmed cases in Kern County[4] and 41 confirmed cases in Yuba and Sutter Counties.[5]

---

[3] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (accessed Mar. 22, 2020).
[4] See https://www.bakersfield.com (accessed Apr. 18, 2020).
[5] See https://www.yuba.org/coronavirus/ (accessed Apr. 18, 2020).

**C.     Effects on Public Health of a COVID-19 Outbreak in Prisons, Jails or Detention Facilities**

19.     Jails, prisons and detention facilities are places where individuals eat, sleep and live in close quarters. These are the type of environments where infectious diseases can most quickly spread. This is particularly true as respiratory hygiene within these facilities are limited.

20.     Detention facilities have limited ability to allow for social distancing, and therefore are unable to effect the kinds of public health response measures that appear to have been effective to date in slowing the transmission of COVID-19.

21.     In addition, detention facilities do not generally have the ability to isolate people who are infected with COVID-19; to test all detainees in order to identify those with COVID-19 infection (whether they are symptomatic or asymptomatic); to provide the acute respiratory support for individuals who manifest severe respiratory distress due to the infection.

22.     Prisons, jails and detention facilities are not isolated from the community. They are part of and rely on the broader community. People from the community—including staff, contractors and vendors—come and go for various reasons. Detainees also need to be transported to and from facilities to attend court hearings, for specialized medical care, or for other reasons. There can also be rapid turnover of individuals in the facilities. With each entry and exit, individuals can bring infectious disease into or out of the facilities.

23.     Typically, immigration detention facilities are also in medically under-resourced areas. This is true for Mesa Verde, in Bakersfield, California; and Yuba County Jail, in Marysville, California. Marysville and Bakersfield are medically underserved. The immigration detention facilities are not designed to handle specialized or intensive care. Thus, if an individual detainee—or many detainees—need specialized care, they must rely on the medical resources that are available in the community. In rural parts of California, these resources quickly become strained and overloaded.

DECLARATION OF SANDRA HERNANDEZ

24.     Compelling evidence and current public health mitigation efforts would suggest that all efforts to avoid a COVID-19 infection outbreak in detention centers would significantly reduce the burden both on employees in those centers as well as the larger community in which those centers reside such that the health care delivery system can cope with existing infections better.

25.     All counties are already burdened or expecting to be burdened by COVID-19, hence the extraordinary public health interventions. But there would be more capacity to respond if detained individuals are released to their homes—where there is less likelihood of infection because there is greater possibility of social distancing.

26.     Access to emergency medical services can be constrained because of the COVID-19 related health burdens increasingly imposed on emergency health services. All individuals in California have access to emergency medical care, regardless of their immigration status. The barrier to emergency COVID-19 care for someone without lawful immigration status in California would be more the capacity of the health system, and not their immigration status.

27.     California's rural hospitals would likely be unable to cope with an outbreak of COVID-19 at a local immigration detention facility. This would limit the effectiveness of the response for the individual infected and needing emergency care. But it would also affect others in the community who might have unmet medical needs.

28.     For these reasons, an outbreak of COVID-19 at immigration detention facilities would have ripple effects for the community at large. Prison health is public health.

**D.      Benefits to Public Health from Release of Immigration Detainees**

29.     In my opinion, there is an opportunity to promote the public health in the communities where the detention centers exist. It would be in the community's best interests to rapidly depopulate these congregate facilities in California.

30.     For the reasons elaborated above, and the reasons which are motivating unprecedented public health directives at the local and state levels, it is my expert opinion that it is in the interest of the public health of the State of California for immigration detention facilities to release detainees into the community. This is true so long as the individuals have a home to go to and they are willing and able to abide by local guidelines and directives.

31.     It is consistent with the public health guidance and priorities of the State to encourage the release of detainees. The unnecessary detention of individuals in congregate facilities in the midst of a pandemic has risks to the individual and to the broader public.

32.     The current recommendations of health care providers in the state are for individuals to rest and recuperate at home, including if they have been tested and/or exposed to COVID-19, so long as they are not experiencing severe symptoms. Under current guidelines, individuals who are exposed to a COVID-19 patients ought to be tested for COVID-19, quarantined for 14 days, and assessed for COVID-19 infection. Therefore, individuals who have been exposed to COVID-19, including in the detention centers, ought to quarantined where they are not in a congregate living situation and not exposing others to potential infection. This is true for individuals who have exposure to COVID-19 in the detention centers.

33.     Even if the aggressive public health interventions across California ultimately result in a stabilizing or improving infection rate, this would not necessarily eliminate the need to decrease significantly the populations in the detention facilities. This is for several reasons. First, the heightened risk of infectious spread inside the detention facilities would continue because of the unique characteristics of congregate settings, even if things improved somewhat outside the detention facilities. Second, the fact that the detention centers would remain as hotspots, or potential hotspots, would pose a threat both to those detained and also to the health of the public in the facilities and beyond. In some ways, the detention centers pose a unique threat to the public's health after there is stabilization outside of the detention centers in the

community, because an outbreak in the detention centers would threaten to reignite the spread of the pandemic when there has been some containment. Absent widespread testing in the community, which does not currently exist in California, it is also impossible to know current case rates and trends in new case infections. For these reasons, the loosening of social distancing cannot happen overnight; there will not be an on-off switch even for counties and the state. The detention centers will continue to pose a risk for those detained and for the broader public for some time after social distancing is relaxed in the areas around the detention centers.

34. Thus, it is consistent with state and local guidance for the general population to immediately depopulate detention centers as they are extremely high-risk for exacerbating the COVID-19 epidemic.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day in April 2020 in, San Francisco, California.

Sandra R. Hernández, MD



**Sandra R. Hernández, MD**
**President & CEO**
**California Health Care Foundation**

Dr. Sandra R. Hernández became president and CEO of the California Health Care Foundation in January 2014. CHCF is an independent, nonprofit philanthropy with assets of more than $700 million, headquartered in Oakland, California, and dedicated to improving California's health care system so that all Californians — especially those with low-incomes — can get the care they need.

Prior to joining CHCF, Dr. Hernández was CEO of The San Francisco Foundation, which she led for 16 years. She previously served as director of public health for the City and County of San Francisco.

Dr. Hernández is an assistant clinical professor at the University of California, San Francisco, School of Medicine and a leadership council member of the UCSF Institute for Global Health Sciences. She practiced at San Francisco General Hospital in the AIDS clinic from 1984 to 2016. She is a graduate of Yale University, the Tufts School of Medicine, and the certificate program for senior executives in state and local government at Harvard University's John F. Kennedy School of Government.

Originally from Tucson, Arizona, she spent much of her childhood in rural New Mexico with her grandparents. There she came to honor and appreciate her Mexican culture and its intrinsic values of community and public service. Her love of science and math was nourished by her father, a self-educated engineer.

Dr. Hernández serves as a board member of Covered California, a commissioner of the Healthy California for All Commission, a trustee of the Reno-based Western Asbestos Settlement Trust, and as an independent director of First Republic Bank. She is a member of the Public Policy Institute of California's Statewide Leadership Council, the United States of Care Founder's Council, the Well Being Trust Advisory Council, and the National Academy of Medicine's planning committee for convening around the future of health services research.

Her earlier affiliations include President Clinton's Commission on Consumer Protection and Quality in the Healthcare Industry, and two Institute of Medicine committees: one on the Consequences of Uninsurance, and another on the Implementation of Antiviral Medication Strategies for an Influenza Pandemic.

Dr. Hernández is a former board member of Grantmakers In Health, the Council on Foundations, the California Managed Risk Medical Insurance Board, the Yale University President's Council, the UCSF Chancellor's Advisory Board, and the UCSF Clinical and Translational Science Institute Advisory Board. She co-chaired San Francisco's Universal Healthcare Council, which designed Healthy San Francisco, an innovative health access program for the uninsured.



**Sandra R. Hernández, MD**
**President & CEO**
**California Health Care Foundation**

| | |
|---|---|
| <u>Education</u> | M.D., Tufts University School of Medicine, 1984, Boston, MA |
| | B.A., Psychology, Yale University, 1979, New Haven, CT |
| | W. K. Kellogg Fellowship |
| | John F. Kennedy School of Government Local and State Executive Program Certificate |
| | Honorary Doctorate, California Institute of Integral Studies, 2006, San Francisco, CA |
| <u>Medical Licensure</u> | Medical Board of California<br>Physician and Surgeon, 1986–Present |
| <u>Medical Training</u> | Residency, Primary Care/Internal Medicine<br>San Francisco General Hospital<br>University of California, San Francisco, 1984–1987 |
| <u>Language Competency</u> | English and Spanish |
| <u>Current Employment</u> | California Health Care Foundation<br>Oakland, CA<br>January 2014–Present |

Employment Experience

Chief Executive Officer
The San Francisco Foundation
September 1997–December 2013


Assistant Clinical Professor
School of Medicine
University of California, San Francisco
July 1992–Present


Director of Health
City and County of San Francisco
Department of Public Health
January 1994–August 1997


County Health Officer and Deputy Director
Community Public Health Services and AIDS
San Francisco Department of Public Health
November 1992–January 1994


Acting Medical Director
Community Public Health Services
San Francisco Department of Public Health
September 1991–November 1992


Director, AIDS Office
San Francisco Department of Public Health
February 1990–November 1992


Branch Chief, Health Resources and Services
AIDS Office
San Francisco Department of Public Health
1988–1990

Current Appointments and Public Service

Healthy California for All Commission
Commissioner
December 2019–Present

United States of Care
Founder's Council
March 2018–Present

Well Being Trust
Advisory Council
March 2018–Present

Covered California
Board of Directors
February 2018–Present

National Academy of Medicine
Planning Committee for the Future of Health Services Research
July 2017–Present

Board of Regents, University of California
Health Services Committee
March 2016–Present

West Coast Healthcare Executive Summit
Member 2014–Present

Public Policy Institute of California Statewide Leadership Council
April 2011–Present

First Republic Bank
Board of Directors
August 2010–Present

Institute for Global Health Sciences Advisory Council
University of California, San Francisco
2009–present

Western Asbestos Settlement Trust
Appointed Trustee
California Superior Court
April 2004–Present

Academic Appointments

Clinical and Translational Science Institute Clinical Research Center

External Advisory Board
University of California, San Francisco
2007–2017

San Francisco General Hospital
Faculty, Department of Medicine
Medical Attending
AIDS Clinic (Ward 86)
1987–2016

Pediatric Leadership for the Underserved
Advisory Council
University of California, San Francisco
2006–2016

Program in Medical Education for the Urban Underserved
Advisory Council
University of California, San Francisco
2006–2016

Chancellor's Advisory Board
University of California, San Francisco
2010–2014

Campus Facilities Improvement Association
University of California, San Francisco
2008–2012

Past Appointments
and Public Service

Betty Irene Moore School of Nursing at UC Davis
National Advisory Council
2016–2019

Health IT Strategic Planning and Innovation Workgroup
Member
2014–2017

Yale University
University Council Member
2011–2016

Blue Shield of California Foundation
Board of Directors
2010–2014

The Center for Investigative Reporting
Board of Directors
2011–2014

Federal Reserve Bank of San Francisco
Economic Advisory Councilmember
2011–2014

National Academy of Sciences Institute of Medicine
Committee on Implementation of Antiviral Medication Strategies for an
Influenza Pandemic
2007–2008

Council on Foundations
Board of Directors
Committee on Inclusiveness, Ethics and Practices
2006–2009

Co-Chair, Mayor's Universal Healthcare Council
San Francisco Health Access Plan
Mayor Gavin Newsom
2006

Chair, Mayor's Blue-Ribbon Committee on the Future Location of San
Francisco General Hospital
Mayor Gavin Newsom
2005

National Academy of Sciences Institute of Medicine
Committee on the Consequences of the Uninsured
2003–2004

Lucile Packard Children's Hospital
Board of Directors and Chair of Public Policy Committee
2003–2010

Corporation for Supportive Housing
Board of Directors, Chair Governance Committee
1997–2008

Blackbaud, Inc.
Board of Directors and Audit Committee
2002–2006

California State Senate-Appointed Member
Managed Risk Medical Insurance Board
1998–2007

Kaiser Permanente
Member, National Advisory Council on Professional and Organizational Ethics
1997–2003

Grantmakers in Health
Board of Directors
1998–2003

Presidential Appointee
President Clinton's Commission on Quality and Consumer Protection in the Health Industry
Co-Chair, Subcommittee on Roles and Responsibilities of Public/Private Care Purchasers and Oversight Organizations
1997–1998

San Francisco Health Plan
Founding Chair, Board of Directors
1995–1998

Scientific Advisory Committee on Antiviral Therapy
Federal Drug Administration
1995–1998

<u>Honors / Awards</u>

San Francisco Business Times
Most Admired CEO
2019

University of California, San Francisco
Alumni Excellence Award
2015

Openhouse, San Francisco
Adelman/Gurevitch Founders Award
2015

Hispanic Business Magazine
Woman of the Year
2008

Tufts Medicine Magazine
Cover
2008

San Francisco Planning and Urban Research Association
Silver Spur Award
2008

Women Healthcare Executives
Woman of the Year
2007

Modern Healthcare Magazine
One of Ten Healthcare Leaders for the Next Century: Up and Comers
1997

League of Women Voters of San Francisco
Women Who Could Be President Award
1993